UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| MICHAEL SALIBY<br>    Plaintiff, | : |  |
|  | : |  |
|  | : | Civil No. 3:03CV01535(DJS) |
| v. | : |  |
|  | : |  |
| PETER KENDZIERSKI<br>and BECKMAN COULTER, INC.<br>    Defendants | : |  |
|  | : |  |
|  | : | October 8, 2004 |

**LOCAL RULE 9(c)1 STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF DEFENDANT BECKMAN COULTER, INC.'S
MOTION FOR SUMMARY JUDGMENT**

      Defendant, Beckman Coulter, Inc., hereby submits its Local Rule 9(c)1 Statement of Undisputed Material Facts, together with exhibits and affidavit, in support of its Motion for Summary Judgment.[1]

## I.     General

1.     Beckman Coulter, Inc. develops and markets biomedical instruments, chemistries, software and supplies that simplify and automate laboratory processes. Customers of the company's biomedical testing instruments include pharmaceutical and biotechnology companies, universities, medical schools and research institutions, hospitals, physician's offices and laboratories.[2]

---

[1] Relevant pages from deposition transcripts and other numbered exhibits referenced herein are appended to the Affidavit of Edward M. Richters filed simultaneously herewith

[2] Affidavit of Patrick Kelly ¶ 3.

2.     William Saliby began his employment with Beckman Coulter's predecessor, Beckman Corporation[3], as a field service technician, in 1978, and the following year became a field service engineer.[4]

3.     In that position, Mr. Saliby repaired, serviced and maintained Beckman instruments for customer accounts that were assigned to him.[5]

4.     In 1989, Mr. Saliby transferred from Beckman's Rochester, New York office to Connecticut, where he worked out of the Branford, Connecticut work area.[6]

5.     From the very outset of his relationship with Beckman's Connecticut operation, Mr. Saliby displayed an extremely paranoid and confrontational attitude, with open disrespect for management.   When he requested, but was denied, a salary increase as part of the transfer to Connecticut, Mr. Saliby reacted hostilely:

> A . . . . And he says, Well, I talked to Joe Ardolino, his supervisor, and he said that they would love to have me move here, but at this point in time they couldn't offer me any money at all other than the obvious advantage of being here, and I looked at him, and I said, You're asking me to commit financial suicide, I frankly don't see any obvious advantage of being here, and so I have to decline the move.
>
> Q   Okay.
>
> A   And he looked at me, and he took his glasses off and threw them down on his desk, and said, Look, I can call Joe up, and he

---

[3] Beckman Corporation re-incorporated in 1988, following a spin-off from SmithKline Beckman Corporation. In 1998, the name changed to Beckman Coulter following the 1997 acquisition of Coulter Corporation  For purposes of this Statement of Facts, we will simply refer to the company as "Beckman."

[4] Deposition of William Saliby, May 6, 2004, (hereinafter "Saliby Dep at") at  21.

[5] Saliby Dep at 23.

[6] Saliby Dep at 24 25, 34, 70.

can say move or you're fired, and I looked at him and I said F-U,
tell Joe I quit, and I walked out and I drove home.

Q   What were the exact words you said?

A   Fuck you.

Q   And you said fuck you, and I'm sorry, go ahead.

A   I said, you can tell Joe, Fuck you, I quit.[7]

6.      Mr. Saliby also exhibited a remarkably unstable emotional state.  In 1992, he collapsed in
the Branford office during a panic attack, and had to be transported by ambulance to a hospital.[8]

7.      As a result of the collapse, which Mr. Saliby subsequently referred to as a "mental
breakdown" in a statement to the Connecticut Department of Labor,[9] Mr. Saliby remained out of
work on an approved medical leave for almost three months, from January 20, 1992 to April 16,
1992.[10]

8.      Mr. Saliby began psychiatric treatment at that time and started taking a series of anti-
depressant prescription medications such as Prozac and Impramine in a "shotgun" approach that
controlled his panic attacks but left him in a lethargic condition.

> . . . [A]fter a period of time, I said I'm not me, I'm still not me.
> I'm not happy, I'm always tired, there's got to be – they've got to
> be missing something . . . .[11]

---

[7] Saliby Dep at 27-28

[8] Saliby Dep at 69-73

[9] See Exhibit 1

[10] Saliby Dep at 73; Exhibit 1.

[11] Saliby Dep at 78 -79.

9.      Although he eventually, "ended up on luvox", which he considered "better than any of the previous ones,"[12] Mr. Saliby continued to act in a progressively hostile and insubordinate manner at work.

10.     In April 2000, Mr. Saliby was placed on a performance improvement plan by his team leader, Bill Briere, due to an unacceptably low number of work hours – averaging only 23.4 hours per week over the prior three months – as well as other productivity issues.[13]

11.     Mr. Saliby's intense response to his management was marked by paranoia and unrestrained anger:

> I am disgusted with the manner and tone of the letter from Bill. I
> believe I was deceived in regard to the content of the meeting. I
> also believe bits of conversations between us is (sic) a non official
> setting were used in his memo and he no longer hold (sic) any
> credibility as a professional in my mind. I feel he owes me an
> apology. The damage this letter has done to my relationship with
> this company and its management is devastating. . . .[14]

12.     During a June 14, 2000 retirement dinner in Burlington, Massachusetts, Mr. Saliby became grossly intoxicated and made threatening remarks to the Director of Customer Technical Service about a Beckman Human Resources Manager, Larry Braun.  Specifically, Mr. Saliby stated: "I'm going to find out where Larry Braun lives and go and kill him and his family."[15]

---

[12] Saliby Dep at 79.

[13] See Exhibit 2.

[14] See Exhibit 3, Page 2.

[15] Affidavit of Patrick Kelly¶ 4; See also Exhibit 4

13.    During a subsequent counseling session with Mr. Kelly and at his deposition, Mr. Saliby could not recall whether he made the statement since, by his own admission, he had purposely gotten himself so drunk that he could not "recall half the evening, let alone even having a conversation regarding this . . . ."[16]

14.    Moreover, Mr. Saliby admitted that he intentionally got drunk on expensive Cognac at the retirement dinner, simply to spite the Company:

> Q   Something occurred during that period that caused you to become inebriated or intoxicated?
>
> A   Yes.
>
> Q   Did you start drinking heavily during that period?
>
> A   No, I just drank heavily at this -- I was ordering $20 a shot cognac, I was doing it on purpose to run up their bill, I ordered the most expensive things on the menu. I was torqued because between this time because of this letter and what they had decided without checking with anybody.[17]
>
>                         *     *     *
>
> A        . . . you know, because if they're going to screw me on my pay, they're going to buy me a good dinner, and I'm going to do this every time they have me go to a company function, I'm going to jack up the bill, because I can do that, I can do something to show them, and so that is what I'm going to do, and so that is what I did do.[18]

---

[16] Saliby Dep at 122.

[17] Saliby Dep at 123.

[18] Saliby Dep at 126.

15.    Mr. Saliby also acknowledged that he was angry with Beckman management for "screwing" him and was "disgusted" with Larry Braun because of a phone call with him about the April 2000 performance improvement plan.[19]

16.    He was also upset because all field service engineers, including himself, had recently been converted from salaried employee status to hourly, which resulted in a significant reduction in his wages since, as a salaried employee, he would receive a full salary even if he completed all of his assigned work in only 23 hours; but he would no longer receive his normal wages unless he actually worked a full 40 hours.  According to Mr. Saliby, the change made him feel "discriminated against."[20]

17.    The Company's concern over Mr. Saliby's volatile and potentially violent behavior resulted in a written reprimand to Mr. Saliby concerning his threatening behavior at the retirement dinner and his abrasive comments to members of Beckman management on other occasions, with a stern admonition that "any future communications of a threatening and/or abrasive nature will be cause for further disciplinary action which may include termination."[21]

18.    Mr. Saliby's disconcerting temperament was also reflected in his February 2001 performance evaluation, in which his new team leader, Rich Raudnael, noted Mr. Saliby's apparent improvement in productivity, but continued anger management problem; emphasizing that:

---

[19] Saliby Dep at 126-127.

[20] Saliby Dep at 129-130.

[21] Exhibit 4.

> Mike needs to maintain a positive attitude towards his job. . . .
> Display of anger towards internal people will not be tolerated and
> could lead to dismissal from the company.[22]

19.    At his deposition, Mr. Saliby provided some insight as to the anger problem that his

supervisor was referring to:

> A   Like if I have a meeting with him or somebody and there was,
> I had a problem with someone else in the company, or I felt
> somebody was being a jerk or an asshole, I would tell them, I think
> this guy is being an asshole because of this.
>
> Q   Would you tell the person?
>
> A   I would tell the person, or I would tell a person who might
> have asked me about it in private. I would never do it in front of a
> group to embarrass or humiliate anyone, but I would be straight to
> the point.
>
> Q   Would you tell the alleged asshole that he was an asshole?
>
> A   Oh, yeah. . . . .[23]

20.    Indeed, at the meeting to discuss the February 2001 performance review with his team

leader and manager, Mr. Saliby pointedly insulted them and stormed out.

> A   This review, was, for reasons that I'll explain later, was that
> from a professional standpoint, both Rich Raudnael and the area
> manager are sitting on the opposite side of the table, and I just told
> them, I says, "From a professional standpoint I've lost all respect
> for both of you. I think you're a couple of spineless worms."
>
> Q   And who did you say this to?
>
> A   My supervisor.
>
> Q   Who was that?

---

[22] Exhibit 5.

[23] Saliby Dep at 133-134.

A   Rich Raudnael and his boss, and the reason for that -- [24]

21.    While continuing their attempts to avoid major disciplinary action, but concerned with his emotional state, Mr. Saliby's management required that he attend a management anger seminar as a performance improvement measure.[25]

22.    Mr. Saliby's hotheaded disposition was emphasized once again in his February 28, 2002 performance evaluation, which included specific examples of his inappropriate, quick tempered treatment of co-workers and his outspoken dissatisfaction with the Company:

> On different occasions you have made improper comments, which have no place in the work place or at a personal level.  On one occasion the Coordinator was trying to assign a service call to you. You told her you were busy and said for me "to get off my lazy butt" and do the call.  One engineer reported that he didn't want you in his accounts because of customer complaints that you used inappropriate language and had bad mouthed Beckman Coulter for the way you felt they were handling your insurance.  At a career banding meeting earlier in the year, you were overheard by the Regional Manager, again bad mouthing Beckman Coulter for the way you were being treated.  In the same meeting, you made a disruptive comment and used vulgar language.  There have also been a few times during the course of the year where you have used vulgar language and exhibited fits of anger during telephone conversations with me. . . . .
>
> Your technical skills are strong and you do a good job in many aspects of your position.  However, we continually have problems with your style of communication, which alienates both our internal and external customers . . . .[26]

---

[24] Saliby Dep at 136-137.

[25] Exhibit 6.

[26] Exhibit 7.

23.    At his deposition, Mr. Saliby admitted to the accuracy of most of the review comments and that he had been "very upset with management," that he had made a number of disparaging remarks to his "peers," and that his demeanor became demonstrably negative.

> Q   The fact is, you speak your mind; isn't that right?
>
> A   Exactly, and from this point on when they had cut my pay and had been doing the things, my attitude  went down in the toilet, I admit that, and frankly, I have no apologies for it.  These people kept dumping on me and taking advantage of me and stiffing me every chance they got.
>
> Q   And that is what you were telling the engineers?
>
> A   That is what I was telling them.
>
> Q   Did you tell the engineers that you thought the company was fucking you over?
>
> A   Yes.[27]

24.    He also admitted that, if he got angry with someone, he would "[t]ell them 'I think you're a fucking asshole . . .'"[28]

25.    As he had done at a previous performance review meeting, Mr. Saliby became angry and abusive, before walking out of the February 2002 meeting:

> Q   So you walked out of a meeting with Vic Hasbrook?
>
> A   Yes.
>
> Q   Did you call him a name?

---

[27] Saliby Dep at 145-146

[28] Saliby Dep at 148

> A   I called him a spineless worm.  After that, and then he asked
> me, What do you want to do?  I said, "I don't want to work for you
> anymore," and I left.[29]

26.    Shortly after the performance review meeting on February 28, 2002, Mr. Saliby's

management decided that, due to Mr. Saliby's continuing behavior problems, the only realistic

option was to terminate his employment.[30]

27.    In light of Mr. Saliby's volatile temper, arrangements were made for Patrick Kelly,

Director of Customer Technical Services, along with Paul Thomas, a Beckman security manager,

to meet with Mr. Saliby at a Branford diner on March 5, 2002, to terminate his employment.[31]

28.    Mr. Saliby assumed that he would be fired at the March 5 meeting, based upon his

conduct at the February 28, 2002 review meeting.[32]

29.    Mr. Saliby admitted at his deposition that both Mr. Kelly and Mr. Thomas treated him

respectfully at all times.[33]

30.    At the termination meeting, Mr. Thomas smelled what he believed was alcohol on Mr.

Saliby's breath.[34]

---

[29] Saliby Dep at 160.

[30] Affidavit of Patrick Kelly ¶ 5.

[31] Affidavit of Patrick Kelly ¶ 6.

[32] Saliby Dep at 157.

[33] Saliby Dep at 169-170.

[34] Affidavit of Paul Thomas ¶ 4.

31.     Although Mr. Saliby denied at his deposition that he had been drinking, he admitted that

he told Mr. Thomas and Mr. Kelly that he had sedated himself for the meeting:

> Q   Do you recall telling Pat Kelly and Paul Thomas that you're
> pretty nervous, you know what was going to happen, and you
> sedated yourself before you came in?
>
> A   Yes, and I did with my medication, because of my back.
>
> Q   Tell me what you said to them.
>
> A   I told them that I took a painkiller because I knew why they
> were here, and I knew that it was go to be upsetting, and I knew
> that when I get upset, I have with my back, so in order to be able to
> move.[35]

32.     Mr. Saliby also admitted that he became "extremely upset" during the meeting, and had

tears in his eyes.[36]

33.     Then, Mr. Saliby became agitated and accusatory:

> Q.     And at that point what did you say to him that you felt
> about the company and your management?
>
> A       Well, I felt -- I told him how I felt, and I felt that I was
> being railroaded, and that I felt the management at least at the level
> immediate to the first two levels was I was being judged on
> inaccurate and erroneous data, and when I was calling them on it
> and saying, Why don't you just check this out, I was being told that
> it is too late, it is too late, it has already been done, this is the way
> it is, and I was just disgusted that we had a really poor
> management, lower level management was really poor.  So they
> took a situation and mismanaged it so badly that it has come to
> this.[37]

---

[35] Saliby Dep at 165

[36] Saliby Dep at 166

[37] Saliby Dep at 168-169

34.     Following the meeting, Mr. Saliby gave Mr. Kelly the keys to his company rental van and Mr. Thomas gave him a ride home, a few miles away.[38]

35.     When they arrived, Mr. Thomas helped Mr. Saliby carry some personal property into his house.[39]

36.     In Mr. Saliby's kitchen, Mr. Thomas noticed that Mr. Saliby maintained a large gun safe and Mr. Saliby acknowledged that he had several guns in the safe.[40]

37.     At his deposition, Mr. Saliby admitted having the gun safe and acknowledged that it was "common knowledge" at work that he maintained a gun collection at home.[41]

38.     Given Mr. Saliby's emotional state, and apparent influence of medication and/or alcohol, Mr. Thomas became concerned that Mr. Saliby might return with a weapon to the "shack" in Branford, which the field service engineers used as base of operations.[42]

39.     As a precautionary matter, Mr. Thomas called the Branford Police Department, which dispatched Officer Peter Kendzierski to meet with Mr. Thomas and other Beckman employees at the "shack."[43]

40.     When they met, Mr. Thomas explained that Mr. Saliby had been terminated for making threatening remarks in the work place, including yelling and cursing at his supervisor.   It was

---

[38] Saliby Dep at 169.

[39] Id.

[40] Affidavit of Paul Thomas ¶ 7.

[41] Saliby Dep at 171.

[42] Affidavit of Paul Thomas ¶ 8.

[43] Affidavit of Paul Thomas ¶ 9

also explained to Officer Kendzierski that Mr. Saliby had told employees that he was depressed and taking medication, and had made comments to the effect that "it is a good thing that he takes medication or he would kill people" and "it's a good thing I take my medication because it keeps me from using my guns on people." Additionally, It was related that Mr. Saliby had made comments to his regional supervisor to the effect that without his job "he would have nothing to live for."[44]

41.     Aside from providing that background information, and mentioning the gun locker, Mr. Thomas made it clear that "Mr. Saliby made no threats and did not become violent" at the termination meeting.[45]

42.     Officer Kendzierski understood that Mr. Thomas was not claiming any criminal conduct on Mr. Saliby's part or seeking his arrest. In his Police Report, Officer Kendzierski clearly stated that "Mr. Thomas wanted to notify police to make them aware of the situation should Mr. Saliby return to where the warehouse is located in Branford." The report also specifies that "Mr. Thomas and Beckman Coulter do not have a criminal complaint." [46]

43.     Following the meeting with Mr. Thomas, Officer Kendzierski went over to Mr. Saliby's home.[47]

---

[44] Exhibit 8 (Police Report).  For purposes of this motion only, Beckman will assume arguendo that the Police Report is accurate in all respects as to Mr. Thomas' statements.

[45] Exhibit 8; Affidavit of Paul Thomas ¶ 20.

[46] Exhibit 8.

[47] Exhibit 8.

44.    Mr. Saliby admitted at his deposition that, when he opened the door and saw Officer Kendzierski, he "made a comment about Larry Braun or whoever made this call" and said "That son of a bitch, I would like to ring that suckers little neck."[48]

45.    In talking with Officer Kendzierski, Mr. Saliby also admitted to previously "saying that it's a good thing I take my medication to keep from ringing the neck of the little fucker, referring to a Regional Manager located in Chicago."[49]

46.    After speaking with Mr. Saliby, Officer Kendzierski had Mr. Saliby transported to Yale-New Haven Hospital by ambulance for an emergency evaluation.[50]

47.    The Police then secured a search warrant and confiscated several weapons from Mr. Saliby's apartment, including a 12 gauge shot gun, a 22 caliber pistol, another 22 caliber pistol with scope, a 22 caliber rifle with magazine, a 306 caliber rifle with scope, and ammunition.[51]

48.    The police did not accompany Mr. Saliby to the Hospital.[52]

49.    Although Yale-New Haven Hospital admitted Mr. Saliby for psychiatric evaluation, after a psychiatrist spoke with him, and temporarily had him restrained after he became violent,[53] neither Beckman Coulter nor Mr. Thomas had any input or involvement in the decision to have

---

[48] Saliby Dep at 182

[49] Exhibit 8.

[50] Exhibit 8.

[51] Exhibit 8.

[52] Saliby Dep at 186-187.

[53] Exhibit 9 (Hospital Psychiatric Evaluation).

Mr. Saliby transported to the Hospital, evaluated at the Hospital, admitted to the Hospital, restrained at the Hospital, or kept overnight at the Hospital for further evaluation.[54]

50.     Mr. Saliby was released from Yale-New Haven Hospital on March 6, 2002.

DEFENDANT, BECKMAN COULTER, INC.

By: _____
     Edward M. Richters (ct. 08043)
     Jackson Lewis LLP
     55 Farmington Avenue, Suite 1200
     Hartford, CT  06105
     (860) 522-0404
     richtere@jacksonlewis.com

---

[54] Affidavit of Paul Thomas ¶ 22.

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first class mail, postage

prepaid on the 8th day of  October, 2004, to the Plaintiff's counsel of record:

John R. Williams, Esq.
Williams and Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

Andrew M. Dewey, Esq.
Baio & Associates
15 Elm Street
Rocky Hill, CT  06067


Edward M. Richters