```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

 MICHAEL SALIBY,                       :
                                       :
      Plaintiff,                       :
                                       :
 v.                                    :   No. 3:03CV1535(DJS)
                                       :
 PETER KENDZIERSKI, PAUL M.            :
 THOMAS, and BECKMAN COULTER,          :
 INC.,                                 :
                                       :
      Defendants.                      :
```

## MEMORANDUM OF DECISION AND ORDER

On September 10, 2003, plaintiff Michael Saliby brought this action for damages against defendant Peter Kendzierski, a police officer in the Branford Police Department, pursuant to 42 U.S.C. § 1983, claiming violations of his rights under the Fourth Amendment to the United States Constitution and Article One of the Connecticut Constitution.  Saliby also brings claims against his former employer, Beckman Coulter, Inc. ("Beckman"), of defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress.  Now pending are defendant Kendzierski's motion for summary judgment (dkt. # 30) and defendant Beckman's motion for summary judgment (dkt. # 33) pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons stated herein, these motions are **DENIED**.

### I. FACTS

On March 5, 2002, Kendzierski detained Saliby for the purpose of conducting a psychiatric examination pursuant to

Section 17a-503 of the Connecticut General Statutes, which provides the following:

> [a]ny police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody, and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502.

Conn. Gen. Stat. § 17a-503(a) (West Supp. 2005).  Saliby claims that Kendzierski did so without proper justification.

Kendzierski's decision to detain Saliby was based, at least in part, upon information provided by Beckman employees about Saliby's behavior on March 5, 2002.  Beckman develops and markets biomedical instruments and other items used in laboratories. Saliby began working for Beckman in 1978, and, since 1989, Saliby worked in Branford, Connecticut repairing and maintaining Beckman instruments for Beckman clients.  At various times during his tenure at Beckman, Saliby clashed with his supervisors about what he perceived to be unfair treatment.  Saliby's supervisors at Beckman reprimanded him several times for using profane language and being abrasive and hostile toward other employees.  The last clash between Saliby and his supervisors occurred on February 28, 2002 during a discussion about his performance review.

-2-

Beckman terminated Saliby's employment on March 5, 2002. Saliby met with Patrick Kelly, Beckman's Director of Customer Technical Services, and Paul Thomas, a Beckman security manager, at a diner in Branford, where Kelly notified Saliby that his employment was terminated.  Kelly also delivered a letter to Saliby instructing him not to return to Beckman property or contact Beckman employees outside the Human Resources Department. Thomas claims to have smelled alcohol on Saliby's breath, which Saliby denies.  Saliby stated that he did take pain medication for his back because he anticipated that he would become upset. Saliby did become upset at the meeting and had tears in his eyes; he also expressed his disappointment in Beckman's lower level management.  The meeting was, by all accounts, civil, and it ended without incident.  Saliby shook Kelly's hand at the conclusion.

After the meeting, Saliby turned his company van over to Kelly, and Thomas brought Saliby to Saliby's home.  Thomas helped bring some personal property into Saliby's apartment.  Thomas claims that he saw a large gun safe in Saliby's apartment, and that Saliby claimed to own several guns.  Saliby denies that he discussed guns with Thomas; instead, Saliby claims that certain Beckman employees were aware of the fact that he owned guns because Saliby discussed guns, sporting, and the process of obtaining gun licenses with these employees.  In any event,

Thomas states that, "[g]iven Mr. Saliby's emotional state, and apparent influence of medication and/or alcohol, I became concerned that Mr. Saliby might return with a weapon to the 'shack' in Branford, which the field service engineers used as a base of operations."  (Dkt. # 36 ¶ 8).  Thomas then called the Branford Police Department.

Kendzierski responded to Thomas's call and met with Thomas at the "shack" in Branford.  Thomas told Kendzierski that Saliby's employment "had been terminated for inappropriate, threatening conduct in the work place, including yelling and cursing at his supervisor."  (Dkt. # 36 ¶ 10).  Thomas also told Kendzierski that Saliby owned guns, "had told employees that he was depressed and taking medication," "had made comments to the effect that 'it is a good thing that he takes medication or he would kill people,'" had said "'it's a good thing I take my medication because it keeps me from using my guns on people,'" and "had made comments to his regional supervisor to the effect that without his job 'he would have nothing to live for.'"  (Dkt. # 36 ¶ 10).  Thomas claims that he "just wanted the police to be aware of the situation in case Mr. Saliby returned to the 'shack' in Branford, where his co-workers might be."  (Dkt. # 36 ¶ 21).

After speaking with Thomas, Kendzierski went to Saliby's apartment.  Saliby initially told Kendzierski to leave his home, and then told Kendzierski that Beckman was attempting to

disparage him in retaliation for his threat to sue the company. When Saliby tried to shut the door to his home, Kendzierski stepped in front of it and thereby discouraged Saliby from closing it.  Saliby then permitted Kendzierski to enter his home for the purpose of asking Saliby some questions; Saliby believes that he had no choice but to allow Kendzierski into his home.

Kendzierski and Saliby then sat down to talk.  Prior to talking, Kendzierski moved a Stiletto knife, which Saliby describes as a "relic [from] World War II that [he] use[s] as a letter opener" out of Saliby's grasp.  Saliby then took the knife back and told Kendzierski to "leave my furniture alone."  (Dkt. # 39 Ex. A at 180:4-10).  Saliby remembers answering some questions, and claims that he told Kendzierski that he did not threaten anyone.  Saliby also recounts the following exchange:

> [a]nd then [Kendzierski] says, Well, do you feel like you're going to hurt yourself?  and I looked at him and I says, No.  And he asked me, I did comment, I did make a comment about either Larry Braun or whoever it was that made this call, I says – oh, I think it was as soon as I opened the door, I knew when I saw him, and he said why he was here, who had called him, I knew what was going on, and I said, That son of a bitch, I would like to ring that suckers[1] [sic.] little neck.

(Dkt. # 39 Ex. A at 182:13-21).  Saliby claims that he repeatedly assured Kendzierski that he would not harm himself, but that he was depressed.  Saliby then states that Kendzierski asked to see

---

[1] Saliby admits that he might have said "fucker" instead. (Dkt. # 39 Ex. A at 188:2-6).

Saliby's guns, and Saliby refused.

At this point, another officer entered Saliby's home with Saliby's landlord and brother-in-law. Saliby told the officer to get out of his house, and the officer refused. When the officers told Saliby that they wanted to take his guns, Saliby refused to allow them to do so without a warrant. Instead, Saliby gave the key to his gun safe to his landlord and instructed his landlord to keep the keys from him for forty-eight hours. He then told the police to leave, and went outside his home with them. According to Saliby, the officers then told Saliby that he must go to the hospital for a psychiatric evaluation, and would not let him back into his home. The officer who entered Saliby's home after Kendzierski then searched Saliby, and he entered the ambulance, where he lay down on the gurney unrestrained.

Kendzierski offers a different account of what transpired while he was at Saliby's residence. Kendzierski states that Saliby invited him into his home, and that Saliby "admitted that he had suffered from depression for over 10 years, that he was currently very depressed over losing his job, and that he needed to talk to someone because he was depressed." (Dkt. # 32 Ex. 3 ¶ 15). In addition to relating Saliby's comment that Saliby would "like to ring the neck of that little fucker," who was one of Beckman's employees, Kendzierski states that Saliby said "it was a good thing he took his medication to help him from doing so."

(Dkt. # 32 Ex. 3 ¶ 16). According to Kendzierski, Saliby said that Saliby "had to leave his apartment because that was where his medication was and he did not want to be near it because he was afraid of what might happen." (Dkt. # 32 Ex. 3 ¶ 17). Kendzierski states that Saliby "admitted to drinking," (dkt. # 32 Ex. 3 ¶ 18), and "had several mood swings," (dkt. # 32 Ex. 3 ¶ 20). Based upon the foregoing, Kendzierski sent Saliby to the hospital for an evaluation.

## II. DISCUSSION

Saliby contends that Kendzierski violated his Fourth Amendment rights. Specifically, he claims that Kendzierski subjected him to an unreasonable seizure. Saliby also asserts the state law torts of defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress against Beckman. Each defendant has moved for summary judgment with respect to each count of the complaint. Kendzierski has also raised the affirmative defense of qualified immunity.

### A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

### B. FOURTH AMENDMENT

Saliby contends that he was unreasonably seized in violation of the Fourth Amendment to the U.S. Constitution.[2] The Fourth

---

[2] In Count One of his complaint, Saliby asserts several Fourth Amendment violations and a violation of Article One of the Connecticut Constitution. (See Compl., Count One ¶ 10). These

Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  Under the Fourth Amendment, an individual has the right to be free from unreasonable seizures, including the right to not be arrested without probable cause.  See Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir. 2002).  "The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate. . . ." Franks v. Delaware, 483 U.S. 154, 165 (1978).  Probable cause is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability" that the person identified has committed the alleged crime.  Illinois v. Gates, 462 U.S. 213, 238 (1983).

Because Saliby was taken to a hospital against his will and confined there against his will pursuant to state law, he was "seized," and this seizure is subject to the protections of the Fourth Amendment.  See Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003); Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993).  "The Fourth Amendment requires that an involuntary hospitalization 'may be made only upon probable cause, that is,

---

claims are discussed collectively herein because they are subject to the same analysis.

only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard.'"  Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993) (quoting Villanova v. Abrams, 972 F.2d 792, 795 (7th Cir. 1992)).

Genuine issues of material fact remain as to whether Kendzierski had probable cause to place Saliby into custody for the purpose of a psychiatric examination.  There is no dispute that Thomas told Kendzierski that Saliby had stated that he had nothing to live for if he lost his job and that Saliby had threatened co-workers in the past, that Saliby made a violent comment to Kendzierski about a co-worker, that he was upset about his employment being terminated, and that he had access to firearms.  There are, however, significant disputes about whether Saliby had been under the influence of drugs or alcohol, whether Saliby threatened to use his medication to harm himself, whether Saliby stated that only his medication prevented him from harming his co-worker, and whether Saliby was acting severely depressed.

Construing the facts most favorably to Saliby, there is not enough evidence to objectively conclude that Saliby was likely to harm himself or others on March 5, 2002.  The trier of fact could find that Saliby's deposition testimony about his meeting with Kendzierski does not describe a person who was a threat to himself or others; Saliby's actions, as he describes them, reflect exasperation, annoyance, and sadness, but not the

propensity for violence or severe depression.  Saliby's account also disclaims the possibility of drug or alcohol induced irrationality or unpredictability.  Assuming that Saliby's account of his interaction with Kendzierski is accurate, Thomas's comments about Saliby's history of threatening co-workers would not, by themselves, indicate that Saliby was inclined to be violent on March 5, 2002 or would become violent soon thereafter. Thomas told Kendzierski that Saliby became intoxicated and threatened to kill another Beckman employee on June 14, 2000 at a Beckman social function.  Thomas also told Kendzierski that Saliby had used abusive language toward his supervisors on February 28, 2002.  Thomas's information may have been sufficient grounds for Kendzierski to investigate further, but a trier of fact could find that Saliby's behavior in Kendzierski's presence did not warrant taking Saliby into custody.  As such, Saliby may be able to establish a constitutional violation.

If the trier of fact accepts Saliby's account of what transpired on March 5, 2002, Kendzierski may not be entitled to qualified immunity.  In <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), the Supreme Court established a three-step analysis for determining whether an officer is entitled to qualified immunity. First, the court determines whether the facts, taken in a light most favorable to the party asserting an injury, could show a constitutional violation.  <u>See</u> <u>Saucier</u>, 533 U.S. at 201.  Second,

the court determines "[w]hether the [constitutional] right was clearly established." Saucier, 533 U.S. at 201; Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Third, the court determines the objective reasonableness of the officer's conduct. An officer "will not be immune, if, on an objective basis, it is obvious that no reasonably competent officer would take the actions of the defendant." Malley v. Briggs, 475 U.S. 335, 341 (1986). If, however, "officers of reasonable competence could disagree," then "immunity should be recognized." Id.

Based upon Saliby's version of the facts, no reasonable officer, acting in accord with clearly established law, would have taken Saliby into custody. Saliby had threatened a co-worker while he was intoxicated about twenty months prior to March 5, 2002, but had never actually become violent. Although Saliby did use profane language when confronting his supervisor on February 28, 2002, Saliby had just left a meeting with Beckman employees where he was calm and composed. Although he was annoyed that Kendzierski had come to his home, and was saddened over losing his job, Saliby was sober and still composed, and there was no indication that he would become violent towards himself or others. Without resolving certain factual disputes in

Kendzierski's favor, or considering Saliby's behavior once he arrived at the hospital, there was no objective justification for placing Saliby in custody.  Therefore, Kendzierski's motion for summary judgment on Saliby's Fourth Amendment claims must be denied.

## C. DEFAMATION

As the Connecticut Supreme Court has recently explained, "[a] defamatory statement is defined as a communication that tends to 'harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. . . .'" Cweklinsky v. Mobil Chemical Co., 267 Conn. 210, 217 (2004) (quoting QSP, Inc. v. Aetna Casualty & Surety Co., 256 Conn. 343, 356 (2001)). "To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." Id.

Saliby claims that Thomas made the following defamatory statements to Kendzierski: (1) "Mr. Saliby made comments to his regional supervisor Victor Hasbrouck to the effect that he was depressed and that his job was the only thing he had to live for and that if he was fired he would have nothing to live for,"

(dkt. # 32 Ex. 3 ¶ 9); (2) Saliby "appeared to have been drinking" at the March 5, 2002 meeting, (dkt. # 32 Ex. 3 ¶ 11); and (3) "Mr. Saliby has also been making statements to employees that it is a good thing he takes medication or he would kill people and said, it's a good thing I take medication because it keeps me from using my guns on people," (dkt. # 32 Ex. 1 at 2). Saliby claims that each of the foregoing statements were false, and that Thomas made the statements with knowledge of their falsity and with malicious intent.

Beckman claims, and Saliby admits, that it can assert a qualified privilege because Thomas made the statements in question to a police officer. See Flanagan v. McLane, 87 A. 727, 728 (Conn. 1913) ("The law implies malice from a libelous publication, except in certain cases of privilege, one of which is when the author and publisher of the alleged slander acted in the bona fide discharge of a public or private duty or in the prosecution of his own right or interest.") (internal quotation marks omitted); see also Mendez v. Vonroll Isola U.S.A., Inc., No. CV020462113S, 2004 WL 944516 at *7 (Conn. Super. Ct. Apr. 8, 2004) ("Connecticut thus adopts the qualified privilege for such communications or reports to the police. . . ."). Saliby therefore bears the burden of proving that Beckman's privilege was abused, and must show that Thomas made each statement at issue "with knowledge of its falsity or reckless disregard as to

its truth." <u>Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.</u>, 234 Conn. 1, 29 (1995).

Saliby could prove that Beckman abused its privilege. Saliby denies the truth of each of the statements, which are potentially defamatory. Further, there is simply not enough evidence in the record to conclusively determine Thomas's motive for making the statements. Beckman has not proven that the only possible motivation for Thomas's comments was a commendable desire to avoid workplace violence. The trier of fact could imply malice from the nature of the statements themselves, which could make an ordinary person think Saliby was mentally unstable with a chemical dependency and suicidal tendencies. Beckman's motion must therefore be denied with respect to Saliby's defamation claim.

### D. INFLICTION OF EMOTIONAL DISTRESS

Saliby asserts both intentional infliction of emotional distress and negligent infliction of emotional distress against Beckman. Beckman argues that it is entitled to judgment as a matter of law on both counts. If, as the court has found he may, Saliby proves that Thomas made false statements to Kendzierski, the trier of fact could find that Thomas's actions were extreme and outrageous, and that Thomas acted with the requisite state of mind to render Beckman liable to Saliby on both counts. For these reasons, Beckman's motion is denied with respect to these

counts.

### III. CONCLUSION

For the foregoing reasons, Kendzierski's motion for summary judgment (dkt. # 30) is **DENIED,** and Beckman's motion for summary judgment (dkt. # 33) is **DENIED.**  The parties shall file a joint trial memorandum on or before March 17, 2006.  The parties shall contact the undersigned's chambers during the week of **January 16, 2006** to schedule a mandatory settlement conference with this court's parajudicial officer.

So ordered this _____ day of January, 2006.

                                                        **/s/DJS**
                              _____
                                **DOMINIC J. SQUATRITO**
                              **UNITED STATES DISTRICT JUDGE**